Good morning, ladies and gentlemen. We have six cases on the calendar this morning. Two patent cases, a case from one of the Boards of Contract Appeals, three government employee cases, two of which are being submitted on the briefs and will therefore not be argued. The first case is the contract case, Gardner Kamya & Associates v. Housing and Urban Affairs, Department, HUD, 05-1524. Mr. Mussolino. Thank you, Your Honor. I am pleased to report that Mr. Mussolino counseled for the appellate contractor in this case. This dispute is here for the second time. In 2004, another panelist board reversed the decision of the board because it concluded that the HUD Board of Contract Appeals had incorrectly determined that there was no alleged consideration for retroactive application of some repricing provisions in the task order modification. The instruction from the panel, if I could refer to it as GK1 for purposes of our discussion, was as follows. The court noted HUD asserts that the term of both modifications are patently ambiguous because they at once referred to future and past performance. The ambiguity issue was not briefed by the parties, and the board made no factual findings or conclusions of law. We think the prudent course is to remand so the board can address these matters in the first instance. And so the board on this remand finds latent ambiguity, correct? The board does not find latent ambiguity. The board finds latent ambiguity and rejects nonetheless contract referendum on Thursday. So your argument is not with respect to the board's conclusions on the latent ambiguity? No, it's not. But, Your Honor, you have highlighted the issue that the board focused on primarily, which was, of course, getting past the patent latent ambiguity issue, which is a threshold determination before we get to contract referendum. The board then relied on the HBI case and others to identify and then attempt to apply the four prong test for contract referendum, and I don't think there's any dispute between us and HUD as to which cases define the procedure for contract referendum and what the four standards are. But isn't contract referendum a canon of construction of last resort? Oh, I would disagree that it's a construction of last resort. I would agree that one of the prongs of the contract referendum analysis certainly suggests that it should not be resorted to if there are better alternatives. For instance, if there is an indication that the party's intent is otherwise available and determinable, notwithstanding the application of contract referendum, I think it might be construed to be a secondary rule of construction. I would agree with that, Your Honor. Obviously, if there is an evidentiary record that is inconsistent with the contractor's attempt to take advantage of an ambiguity in the contract, for instance, where he understood that the government intended a particular intent and had only erred when it drafted a particular provision, then primary rules of construction are going to control, and that's built into the third prong, I suppose, and the fourth prong of contract referendum. So we should first try to see if we can interpret the contract on the face of it. Well, in this sense, I believe the court's best procedure is first to determine whether or not there is an ambiguity. In order to do that, they have to determine whether there are two reasonable interpretations competing, yes, but none of the most reasonable. Okay, so why is this ambiguous? It strikes me as a pretty good argument that it's not ambiguous when you read the contract on the face of it. First of all, it would be kind of an unusual thing, wouldn't it, to reprice past work when you're extending the contract, and looking at the language here, it's susceptible of a construction, at least, that it's not intended to reprice the past work. Well, that was the board's conclusion. The board concluded that there were two reasonable alternatives, and it discussed the task order's effective date language, but it also discussed the change in the period of performance from 15 months to 21 months. And if you look at the advantage or the disadvantage of the construction of this modification of the task order is it's very brief. There's no boilerplate language that has guidance one way or the other. It's two or three pages long. Well, what is there in the language of the modification that suggests that it was supposed to price retroactively? The first is that the period of performance was changed from 15 months to 21 months. Let me start from the beginning. The first was this was not a new task order, it was a modification of the old task order. The language in the modification makes clear that all of the remaining terms other than those set out in the modification are going to be adopted, which we would suggest includes the very formula on page 3 of the task order. I'm not understanding. What is it in the language of the modification that suggests retroactive pricing? The actual language of the task order modification says that... What page is this on? It's on 95 of the defendant's appendix. Yeah. The first change in the text... This is the second page of the modification, but it's not page 95. The period of performance is hereby modified to read 21 months from the effective date of the award, and the old task order it read 15 months. The paragraph 2 is that probably equally says that the contractor shall continue performance of the services required under this task order at the same unit price per review specified for the respective categories on page 3 of the task order. I've read it, but what's the language in here that suggests that there was to be retroactive price adjustment? Yes, Your Honor, if you look at the task order, the phrase unit price per review, the task order that's being modified, which I think is a derivative 46, unit price per review is a heading for a chart that contains the prices for the various categories. If you follow this task order and do what it says you are to do, which is to take these two terms and plug them into the old task order, this is what it said because it says, except as provided for herein, while other terms and conditions remain unchanged and in full force in effect. So if you're to mechanically do what this suggests you are to do, you would go back to the task order, change the period of performance as it suggests here from 15 to 21 months, and you would change the numbers in the column for unit price per review from the numbers that are in the task order as it existed before this modification to the numbers that were ultimately going to be generated as a result of the DCAA audit. I don't get it. I mean, this modification says that continued performance and the old prices shall remain in effect pending results of the audit. Doesn't that suggest that the pricing is going to affect the continued performance and not the old performance? I agree with the first part but not the second part. The reason the pricing is going to affect the newer perspective performance but also the old performance because as I say, if you follow the mechanical instructions here, all you have, all you will have is a task order with new numbers in it for a period of time that includes the entire period of the task order. So the simplest way to read this, which I would suggest is the right way to read this, is this does nothing more than in effect retroactively change the language in the task order. If you take these numbers and plug them in and then read the task order as it's been modified, there will be no provision that suggests that there are different rates depending on the effective date as described in the task order or as delineated by the commencement of the extension period. But what am I missing here? Mod 2 says such prices shall remain in effect, the original prices, pending results of the audit in subsequent negotiations of the unit prices. In other words, there was no agreement to apply new prices to work already performed. No, we disagree entirely. That's exactly what the agreement was. You mean the language that I read? Yeah, I think, excuse me, I think if you look at such prices, the only thing you can refer back to is the phrase unit price per review. That's all it can refer back to. And that's the heading that's on page 3 of the task order and it's in the nature of the chart. And if you change the numbers mechanically under that particular heading, it necessarily is going to apply to the entire period of the task order. But why isn't it more reasonable to read it as saying such prices shall remain in effect for the continued performance pending results of an audit? Well, our position is that it's less reasonable to do that because if you look at the explicit language and you ask what the phrase such prices refers to, it can only refer to, in fact it says it refers to page 3 of the task order. So if in fact it refers to page 3 of the task order and that heading refers to all of the charges over the life of the task order, then it seems to me the reasonable interpretation has to follow. To the extent that the old task order is still to define agreement, no one argues that it isn't, and to the extent that this modification does nothing more than change what it says it changes, namely those two terms, and it's not a brand new contract which changes anything other than what it says it changes, then the clear import of this provision is that all that's changing is the pricing from the task order. The task order says the prices are going to be paid over the life of the task order. In fact, what it says is from the effective date of the task order, and I note that there is an effective date of the task order, which is 1996, I believe. Nothing to suggest that even that language changes. In fact, the disclaimer at the bottom, the restriction at the bottom will say otherwise. Well, I'm missing a little something here because isn't there another intervening sort of issue, which is really the last sentence which Judge Lurie quoted, subsequent negotiations of unit prices. I thought the deal here was the question here involved whether those negotiations were intended to have covered retroactive and prospective. I mean, isn't another question in this case about what the nature, what the commitment was with respect to the scope of negotiations? I don't think there's, I don't think anyone disputes that the parties did not prior to the time, or no one can sense that prior to the time of the ratification of this modification that there was any exchange between the parties. It was concrete enough for them to have determined that that was an issue of dispute. Certainly, the history that's laid out in G.K.A. 1 suggests that Gardner King, the contractor, was consistently trying to get what amounts to a retroactive modification because when the rates were lowered by HUD in the first place, HUD objected. But is that the latent ambiguity here? Is the ambiguity dealing with this phrase as to whether or not the agreement to conduct subsequent negotiations of the unit prices included or excluded the retroactive pricing? No, I think the latent ambiguity is whether the reference to such prices as opposed to the, I may be agreeing with the court, I'm focusing on the nature of the timing of the negotiations, but the issue, it seems to me, the ambiguity is whether the phrase such prices refers to prospective pricing, say pricing from the effective date of the modification, or pricing over the life of the task order itself as modified, which goes back to the commencement of the task order. You are well into your rebuttal time. Would you like to save it or continue? I'll continue. Good. Needless to say, the board found that there was a patent ambiguity. The board found there was a latent ambiguity and went on to test under contra preferendum. Your Honor, is it correct that if openness This whole process of using contra preferendum seems so convoluted. At the end of the day, they get back to saying, well, if we put aside contra preferendum, we look to see what the most reasonable interpretation of the contract is, and the most reasonable interpretation is that it's only future pricing. Why don't you get to that right off the bat? There are policies behind contra preferendum that include ensuring that the drafter, as they say, shoulders the burden of clarity and agreement, and the policies that are otherwise imposed on the government when contra preferendum applied include trying to encourage the government to draft agreements that are consistent for future purposes. So there's a policy to it. If contra preferendum applies, the analysis that we've all had about which of the two reasonable constructions to apply never gets reached. That's what I don't understand. Why wouldn't you first ask what's the most reasonable interpretation of the language and see if that answers the question for you? And only if you can't find what the correct construction is by adopting the most reasonable construction do you go on to this interpretive rule of last resort. But that's not what the Court of Appeals has instructed in the past. It has said that there are two levels here. So long as there are two reasonable constructions, and so long as the ambiguity is latent and not patent, we look first to whether or not we're going to apply contra preferendum because of the policies that underlie it. And if, in fact, contra preferendum applies, and I think it's clear that it applies here based on what we've argued and I'm touching on briefly, we don't get to the choosing between two reasonable alternatives. We don't decide which is the most reasonable at the outset? Oh, no. You just decide. All you decide is whether, in fact, each of the proposed constructions is reasonable. Which case says that we don't consider at the outset what's the most reasonable construction? Well, if you look at HPI, it says that there are four. It says first it lays out the procedure for analyzing a claim such as this. And it says first we determine whether or not there's an ambiguity. And that's whether or not there are two reasonable constructions without choosing. But that doesn't answer my question. What case says that in determining whether there's an ambiguity that we don't ask ourselves what's the most reasonable construction of the actual language before we go to contra preferendum? I think HPI says that clearly because it never reaches the issue of which of the two alternatives it has gone to choose as among the two reasonable alternatives. Doesn't it start with the idea of ambiguity and then decide how you deal with ambiguity? It does exactly that. So it's like saying, why don't we look and read the contract first? Maybe we never get to ambiguity. That would take a change in the law of the circuit, though, because, as I said, the policies behind contra preferendum are considered, in my view, I think correctly, more important than a court sifting through two reasonable interpretations and deciding which is the protection, it seems to me. Because if there are two reasonable interpretations, then you get to contra preferendum and go through that procedure. If there aren't two reasonable interpretations, if the court says this interpretation makes more sense, that should be the end of it, which is Judge Dyke's point. Well, except then you're leaving out contra preferendum, except, as the judge says, as a last resort when you can't pick between the two. And I don't think that's what the case law in the circuit, but I do want to emphasize that it's not as if the contra preferendum is going to lead to the enforcement of provisions that the parties didn't intend. The four prongs of contra preferendum made clear that the interpretation that the contractors asserted is a reasonable interpretation in the first place, and that it is in fact, both subjectively and objectively, what he intended at the time. And the purpose and the policy behind it is to ensure that the drafters of contracts, when the principle applies, it doesn't apply all the time, bear the responsibility as between whoever is going to bear the responsibility. I think we understand your point, and you have consumed all your time. Mr. McNamara. May it please the Court. This Court can begin and end the analysis here with the plain language of the modification. I think that what the Court is struggling with about when to apply the doctrine of contra preferendum is correct that first we begin with the plain language. Then if we determine that there's an ambiguity, we ask is that ambiguity patent or is it latent? If it's latent, then we apply contra preferendum. In this case, the plain language of disagreement requires only that the parties enter into subsequent negotiations. It requires nothing more. That's the only reasonable construction of this doctrine. But the board decided there was an ambiguity, right? The board did. You're saying we can decide that there isn't. Yes, you can. And should. Yes, you should. If you do decide that there is an ambiguity, you should decide that that ambiguity is patent. Because there's a glaring omission here that any reasonable contractor, and that's the standard, any reasonable contractor would look at this modification and say where is the retroactive repricing language? But is your argument then that at most this would be provided for negotiations, and so at the end of the day there was no commitment on its face to actually do this? Is that what you're saying? Is that on its face there's no ambiguity because at most all it requires is negotiations? That's correct. And negotiations about the price term, not about the timing. And I think that's crucial. But what if we were to read then subsequent negotiations of the unit prices? Isn't there an ambiguity as to whether or not you're saying unit prices means and is limited to one thing? Isn't there an ambiguity as to whether or not negotiations that were committed to here covered retroactivity or not? I don't think so because we have to look at the rest of the modification. It contains an effective date, July 1, 1997. And looking also at the other evidence in the record, there's simply no evidence that before this modification was signed that either party intended the modification to apply retroactively. That's why I don't think there's any ambiguity in the term negotiations. Just from a factual perspective, the parties here agreed that there would be a DCAA audit, and once that audit came in, they would adjust the prices. They just simply never agreed that there would be any kind of retroactive repricing. So the term negotiations I don't think is ambiguous. But, no, the ambiguity lies, I think, arguably, in negotiations of the unit prices and the scope of the negotiations then of the unit prices, where the unit prices is ambiguous as to whether or not it would cover retroactive pricing as well as prospective pricing. Again, I don't think that, as GKA has asserted here, that there is some sort of mechanical process that would occur here with the prices. The task order, you simply plug in the new prices to the old task orders. I don't think there's any ambiguity there in terms of the timing. I think unit prices just simply apply prospectively. Now, did the government take this position before the board? In other words, that there's no ambiguity and on its face it's clear, or did the government concede or agree or argue ambiguity to the board? The government argued that the plain language of this agreement could control. I don't think that we made before the board the specific argument that negotiations, that all this requires negotiations. We did say before the board that the plain language controlled. And I'd just like to point out that we are the appellee here and we are free to raise whatever alternative grounds for relief. This Court has said so in its independence department. We're free to raise these alternative arguments. Isn't it the key question as to what remain in effect means? Remain in effect with respect to past work or remain in effect for the work under the extension? One might suppose that remain in effect means remain in effect for the ongoing work as opposed to the past work. I think that you can read remain in effect. I think if you look at it, it does suggest it was in effect in the past. It shall remain in effect in the future. I think that that's a pretty reasonable reading of the modification. Again, even if the Court decides that the language is ambiguous, it should decide that there's an ambiguity here. Because if you look at the line above this language that we're talking about, the 21 months of performance, any reasonable contractor would look at that and say, well, where is the retroactive repricing language here that we were so concerned with? And GKA maintains that it was concerned with retroactivity throughout these negotiations and that they would never have agreed to this modification without such a provision. Well, where is it in the language? GKA reviewed this language and was quite happy with it, which leads, I think, also to the argument about latency ambiguity here, which is what the Board relied upon. Contra pro forensic should not apply here for the reasons that we've talked about already that the plain language can control. But it's also important to realize that this is a negotiated, this is a bilateral negotiated modification. Contra pro forensic is inapposite in this kind of situation because both of the parties had a hand in drafting this modification. It's unfair, it would be unfair to place some sort of burden upon the government just because the government happened to write the modification. Well, what do you mean both parties played a role in drafting the modification? Well, the modification was written by the government, certainly, but GKA reviewed it and signed off on it. And we had this sort of scrivener – maybe it's not really a scrivener's function. We did draft the modification, but GKA reviewed it. But then how would it ever apply? I mean, isn't it always the case if you've got some agreement between the parties, the other side presumably has always reviewed it and signed off on it. So to me you're saying that this principle would never be applicable under any circumstance. Absolutely not. The typical government contract's case where you have a raft of specifications, say, in a contract where the contractor can simply agree or disagree, but doesn't actually have a hand in changing those specifications or modifying those specifications, as happened here. I think that that's the situation where a contract referendum is meant to apply, where there's a lot of specifications in a contract. It's not based upon the number of specifications, but where essentially there are specifications in the contract, there's a solicitation, and the contractor has to either sign on or not sign on. You own a government contract. You mean in a situation in which the government drafts the contract without input from the contractor. Exactly. And that this was a situation in which there's input from the contractor before the drafting actually takes place. Exactly. And that's just – it's simply unfair. What case says that contract referendum doesn't apply under those circumstances? If we look at the Thule Lake case and the Consumers Ice case, and also which are older cases, but then more recently we look at HPI, where the court specifically noted toward the end of that decision that the procurement was not negotiated. It didn't really consider the issue, but the court noted that it wasn't a negotiated agreement. I think that that is a really crucial point with regard to Lakeland. The board's findings with regard to the third and fourth prongs of the contract referendum test, the HPI test, were also supported by reasonable and supported by substantial evidence. The intent of the parties here otherwise appears. The board for that proposition relies upon two documents in the record. One is a summary of negotiations drafted by HUD, and the other is a letter from GKA's president. Both of these documents reveal that neither party intended this modification to apply retrospectively. So because of that, the intent here otherwise appears in the record. The fourth prong of the contract referendum test here is also unsatisfied because GKA did not actually and reasonably construe this modification to apply retrospectively. Again, as we've talked about, this was a negotiated— But didn't they already—didn't we already, assuming you follow the board's logic, hasn't there already been a determination that this was a reasonable construction? I'm a little confused by the fourth factor because it seems redundant or it's sort of we're already revisiting the reasonable factor. I don't think so. I think if we look at the second factor, which requires that there be two possible reasonable constructions, and then we look at the fourth factor, I think there's a distinction there between whether or not the construction is reasonable and whether or not the party actually construed the construction as reasonable, if that makes sense. And I think here GKA did not construe. There was no—there's no evidence of their interpretation. Even though there may have been two reasonable interpretations, GKA never— I guess this is on the word construed, yes or no. And again, there's no contemporaneous documentation showing that GKA had this belief before it signed the modification. After the audit came in and they saw there was more money to be had than this, all of a sudden there's a dispute and this interpretation comes to light. But there's nothing before the modification itself showing that GKA had this interpretation. And there's certainly nothing from HUD showing the same thing. And the emphasis, I think, GKA takes issue with the board's emphasis on documentary evidence. And the board did that simply because the testimony was so diametrically opposed. GKA—the president of GKA testified that he certainly intended this to apply retroactively. HUD officials said we never intended this to apply retroactively. Diametrically opposing testimony so the board looks to—the only thing the board could look to to resolve the issue of intent was the documentary record. Let me see if I can summarize if I'm understanding the government's position then. That, I mean, you agree with the result here, but your argument is, on the analysis, the way to get there is, firstly, there's no ambiguity. Secondly, even if there were ambiguity, it would be patent. Thirdly, even if the ambiguity were latent, this doctrine wouldn't apply. Fourthly, even if this doctrine applied, it's not met. Am I sort of summarizing the alternatives? I think there's only three. That could have been in a brief of two pages. Very effectively. I think—no, I don't think that's quite right. If the doctrine applies, then it— You agree with the board that it's not— No, the board found the doctrine didn't apply. Okay. But if the doctrine—what I meant is if the doctrine is applicable to this case because you're first arguing that it doesn't even come into play. Right, because of the negotiations. If the doctrine—yes, if the doctrine is applicable, if we leave aside the negotiation part, we say that it does not—they do not satisfy the HBI test. I understand that our arguments are sort of in the alternative, but they all stem from, I think, the same fundamental facts in this case, that this was a negotiated procurement. There was no intent on the record, and it's just simply unreasonable to construe this modification the way the GKA says that it should be construed. And for these reasons, we ask that the board— Thank you, Mr. McNamara. Mr. Mussolino chose to use his time, and we have to hold you to that. So the case will be taken under advisement.